Case number 19-2305, United States of America v. Daniel Gissantaner, argument not to exceed 15 minutes per side. Mr. President, you may proceed for the appellant. Thank you. May it please the Court, Justin President for the United States, I'd like to reserve five minutes for rebuttal. The District Court erred when it elevated Daubert from a gatekeeping function to a much more exacting standard. Daubert, after all, says anything that is not junk science should be admitted and tested by the adversarial process of cross-examination and, if available, a qualified competing expert. But that's not what the District Court did here. StarMix, after all, is anything but junk science. All agree that probabilistic genotyping is the present and the future of DNA mixture analysis, and that StarMix is the leader among probabilistic genotyping software. Junk science is pejorative, and I'm not sure that's exactly how the line works, but if we're going to go down that road and those are the terms you're going to use, it is junk science at some point. Don't you agree that there's some level at which it shouldn't be admitted and has a risk of misleading juries? Well, Your Honor, I respectfully disagree that... So you would say every case the government uses StarMix, so you could be down to 0.001% possibility. Just let the jury fight it out. They get their witness, we get ours. There's no gatekeeping function at all with StarMix. Is that the government's position? No. No, Your Honor. I'm sorry to clarify that it's not the government's position. The government's position is though the software has been proven to basically work down to no DNA, it's still a requirement that the internal validation study cover for the particular lab cover the minimum amount of DNA being used. So there still is a role for Daubert in this area? Yes. Of course, the Daubert decision absolutely applies to probabilistic genotyping in general and StarMix in particular, but StarMix has proven generally that it clears that threshold and it's also proven that in this particular case that the Michigan State Police satisfied the Daubert I think was dedicated to the general reliability of StarMix, but the district court's opinion seemed to really be focused on just the reliability or the testing validation of it at the specific percentage, 7%, the specific weight, what, 49 picograms. Why... Wouldn't we have to conclude that it was an abuse of discretion for the district court to have found that it wasn't adequately tested at those levels in order for us to reverse? The key point I'm trying to make is if we focus on it just on the specific facts of this case, the district court's opinion could be read very narrowly that it's only with respect to this lab and these levels. And why would we say that that was an abuse of discretion if we interpreted that narrowly? Yes, your honor. So I think the district court's opinion, you're correct, can be read narrowly. It's also can be read quite broadly because it makes broad statements about the technology and how it's not really evidence at all because it's too complicated and relies on all these theories. But even if you just focus on the narrow portion, the specific portion, the percent contributed by government introduced evidence. It gave Dr. Crane exactly what he asked for, his deposition, that Starmix had been tested down to and below those levels by the Michigan State Police. And I'm of course referring to government's Exhibit 40, which is also in the record at 146-14. It's a letter where after it became clear, mind you, 18 months into the litigation when this new argument about this interaction effect arose, the Michigan State Police said, well, we've done experiments like that. We just didn't write up the data in the summary of the internal validation study because we didn't think that was important. But what's wrong with the district court's response that, well, Dr. Crane said it didn't have all the useful information, including the likelihood ratios for those specific tests? Why would that be considered the response, the district court's point was Dr. Crane's testimony? Why would we consider that an abuse of discretion? Well, I think it's an abuse of discretion because of the way the proceedings developed below, right? So there was kind of the ever-shifting focus of the Daubert inquiry. This argument wasn't raised in the initial motion or at the initial hearing or in the supplemental briefing after the initial hearing. And I think the record would look quite different if it had been because then those issues would have been joined. The government wasn't permitted to call- Are you making the point that it's an abuse of discretion to make that ruling without more evidence? Is that your point? I think if that's what the case is going to turn on. Now, the government doesn't think that the case should turn on that issue and doesn't actually think Dr. Crane's criticism is valid. So I think the court can say looking at all of the evidence of testing, including at low levels of DNA, if you look at the developmental validations, the published studies, the work that the Michigan State Police did, and you look at all of it, I think you can find an abuse of discretion in the way the court weighed the evidence. But I also think that you can say if a year and a half into the case, if you're going to rely on this new argument, and Dr. Crane says, this is what I need to see, and the government shows it to him, and then Dr. Crane says, well, no, actually, now I want to see the electropharograms and I want to see the likelihood ratios, then yes, you should give the government an opportunity to offer that evidence if that's going to be critical. Now, the problem is- So just again, just to make sure I'm getting the point, that's really not an abuse of discretion ruling. That's a ruling that says the district court jumped the gun. They needed to give the look at it. That's what it sounds like the way you just framed it. Well, I think that's part of the problem. Now, the government isn't asking for vacating for further evidence because I think this process that we're going through would really just keep going. You'd show him the electropharograms and he would say, well, I want to see something else. Then you'd show him the likelihood ratios and you'd say, well, let's investigate this likelihood ratio. And you can always, in any scientific process, you can always say, well, let's look at more data. Let's look at more evidence. And the government's view is that Daubert does not require the defense expert to be invited into the laboratory for the internal validation study. There's a certain point at which you have to say, well, we need to see this evidence. The lab did it. And the lab showed that they had conducted the experiments that he was concerned about, which is corroborated by all of the other evidence that is all the other studies that have been done about the way StarMix behaves at similarly low levels of DNA. Yeah. Can I ask you this? This is more of a, I guess, switching from facts to law. It really gets to what Daubert means almost by the key sentence. And Daubert is ordinarily a key question to be answered into determining whether a theory or technique is scientific knowledge that will assist the tree or try or effect will be whether it can be and has been both sides. What's the level of generality at which we have to determine whether it has been tested? Because obviously StarMix has been rigorously tested generally. And there's also plenty of evidence to suggest that it has been tested at lower levels, just at other labs. Is that enough? Is it a legal question what this language means by how much testing is necessary? And is that enough under this test? Or do you have to actually boil down to the specific facts of this case and ask whether it has been tested under the specific facts? Your Honor, I think it's both. I think there is a legal component when you say, well, what evidence is the district court supposed to look at under the testing factor? That is a legal question. I think the answer to that is it's supposed to look at all of the evidence before it, which in this case includes the developmental validation, the compilation of 31 laboratories' internal validations, the FBI's internal validation, all looking and confirming similarly low-level DNA to the work that was done here. But no one disputes that the individual laboratory has to conduct an internal validation. And I think you and there's no distinction between standards and guidelines in the way that it's used in the Daubert framework. Here are the guidelines you have to follow when you're conducting your internal validation study. And there was no dispute in the district court or really until Amici filed their brief that the Michigan State Police fully complied with the SWGDAM guidelines when they conducted their internal validation study. And the Amici, for reasons we explained in the reply brief, are just flat-out wrong when they say that Michigan State Police weren't consistent with it. And one of the government's witnesses at the initial hearing actually sits on SWGDAM, and he was the one who supervised the internal validation study. So I think it's both. I see my time is up, and I'll address any additional questions. Counsel, just one quick other follow-up. Do you know of any other cases that are are you aware of any other cases like this one where, because there are not a lot of court of appeals cases about stormics, and I'm just curious if you're aware of any others making their way up to the federal system. Your honor, in the in the federal court of appeals, I am not aware of any. There are some district court decisions. I'm not sure if those are on appeal yet. I do know that the second circuit last year released the Jones decision regarding a different software, FST, but not specifically regarding stormics. Okay. All right. Thank you, and get your full rebuttal. Okay. Thank you. I froze for a minute. Good morning. I froze for a minute there, so may it please the court, Joanna Clute on behalf of Daniel Gibson Tanner. I'd like to respond to a couple of the government's points, but before I do so, I first want to underscore that this is not a challenge to stormics per se, as I think the court has recognized. This is a challenge to its use by a particular lab on a particular type of sample. It was neither the district court's opinion nor is it our position that a wholesale rejection is appropriate here. This is not an ordinary case. This is not a mine run of the software. This is a fact pattern that is beyond the edges of an established reliability for these DNA mixtures in two ways, involving a low minor contributor, very low, and a very tiny amount of DNA. There are many subjective decisions, as the record demonstrates, along the different steps in the system, and these compound upon one another. All of these factors influence the ultimate likelihood ratio that's presented to the jury, eroding its relevance and its reliability, especially involving low template DNA with a trace minor contributor. I agree with you that it really comes down to this, not generally stormics, but this specific test. I wanted to get your thoughts on what Daubert means by the testing factor, because when it talks about whether a theory or technique can be or has been tested, it's obvious that it can be tested even at these low levels, so it can be dissatisfied. There's also been a lot of testing with respect to the theory or technique, if we interpret theory or technique just generally as stormics. Your response, I think, would be that you should interpret Daubert to suggest that the theory or technique means with the specific sample levels and weights and percentages. I'm wondering if that's correct. That seems like a legal question to me, about what Daubert means when it says it can be tested or has been tested. Do you have any cases to suggest that this case-specific level is what is required to meet this testing factor? Your Honor, I think that the Daubert standard requires some baseline validity, and that would be independence in testing, and it needs to be robust. It needs to be robust on these types of samples, not necessarily precisely these levels. If you're looking at the internal validation, for example, that Michigan State Police completed, we're looking at about five samples. We don't know anything about those samples. We don't know anything about what the likelihood ratios were generated, whether those tests were repeated. It appears that they were. These are not detailed tests, and they're very uninformative. The independence is a critical factor of testing, and Daubert holds that. Here, we have no validation summary that's performed by any other agency that doesn't have a law enforcement objective or a financial incentive. Ideally, we would have some sort of functional equivalent to, say, the National Highway Traffic and Safety Administration completing some sort of objective, robust testing. Perhaps NIST could do that. It may not be its role, but incidentally, that was the aim of the PCAST report and what they were trying to encourage, bring together many experts without a vested interest in the outcome to scrutinize certain areas of forensic science, and that's what good science requires, is scrutiny. The, we also don't have, I'm sorry, go ahead. Of course, there's a question. Go ahead. I have a question about this particular, the STORM-X product or process. It seems to me your argument is based on an assumption that there are varying conditions from one lab to another that affect the reliability of the results. Is that basically what you're saying? That's just one dimension of the variability in these analyses. Every lab is different. Every lab has different settings. Every lab has different drop-in and drop-out settings. So, that's something that can, we're not asking for every single permutation of the data, as the government accuses. That's not what we're asking. Your standard is calling for, in every case involving STORM-X, there has to be an internal validation protocol that has to be followed in every STORM-X case. Even though you're saying it's just for this case, it sounds like to me the rule you're articulating is it's going to require some hyper-review of every lab, every time this comes up. Is that what you're saying? An internal validation study is required, and the community agrees with that. So, you do have to perform an internal validation study every single time you get this software. So, that's already a component, but if you're going to perform that, it needs to be… The question is, what is that review? I mean, what does Dalbert say the review has to be? Because it's really just the level of review. I mean, you can have a more generalized internal validation, or you can have a less generalized, but you can always make it more specific. So, where do we draw the line here? Because that's going to happen in every case. As to the internal validation, you need to have more than five, and you need to repeat those tests and show that you're getting similar likelihood ratios each time when the parameters of the epidemic… How many do you need? I would defer to the community on that, but I think the testimony shows that the community the community that doesn't agree, and in fact, Judge Neff found that five is not enough when you're not giving the actual data and you're not repeating the tests to show that you're getting a similar number. Can I just on this, giving the data point, what do you think about this way of thinking about the case? So, it's… I'll call it a, quote, hostile question. So, this is a theory of the case that is not good for your client, but just tell me what part of it you really disagree with. There are four factors. I would say Judge Neff understated the government's ability to comply with the last three factors. It seems to me the last three factors all very strongly support the use of StormX. That leaves the first factor, okay? And I felt like her analysis gets close to abusive discretion in terms of not appreciating the way the last three factors favor the use of StormX. As to the first factor, which clearly is the key point, it does seem a little strange they didn't give the government one more chance to get those numbers. I mean, if that's what the community wants, why not give them one more chance? And then my… the last part of that approach would acknowledge just because StormX may be clear d'Albert doesn't mean that this kind of evidence by itself would support a conviction under Jackson versus Virginia. It's part of the broader mix. In fact, my first instinct is this, in this particular case, this info by itself would not suffice to uphold a jury verdict in favor of the government. So, how do you react to that way of thinking about the case? Yeah, I would respectfully disagree that the other three factors suggest that it shouldn't be admitted. The general acceptance factor, I think the dispute within the federal government itself amongst the experts, amongst… between the statisticians, between the people who testified in this particular case shows that there's still disagreement about its application specifically. Are you referring to PCAST or what do you mean where you… I'm referring to, for instance, Dr. Lund's testimony contrasted with Dr. Coble's testimony, Dr. Crane's testimony in favor of the… arguably in favor of the defense contrasted with Dr. Buckleton's testimony. There is disagreement here about whether or not this has been deemed reliable for these types of samples. And that goes to also the peer review factor. This hasn't been adequately peer reviewed because most of the literature and the studies that have been performed are coming from the law enforcement community or from the developer. And… You think it's… I thought that this might be another legal question about what peer review means, but I thought peer review is about the fact that it's been published in scientific journals who are willing to refuse to publish something that they think is garbage. And so, it's the fact of publication is the important component, not the author. That's my understanding of what peer review is. So, even if the author is biased, the scientific community, when they review of the article and say, well, this is sufficient to go in our journal. That was traditionally my understanding of peer review, but am I mistaking on that? And why should we think it's really about the author? I think it's important to consider the author. In this case, it's not going to… There's no bright line rule whether or not an author is involved in a peer review publication. In this case, almost all of the publications involve an author. And I think at that point in time, you have to start questioning whether they've ever been meaningfully peer reviewed. I did want to bring up to address your question, Judge Sutton, the final factor with regard to error rate and standards. There are no binding standards. There are none. All of this for validating software or for determining… Looks like you froze. With that backdrop, there are generally accepted guidelines, perhaps generally accepted within the law enforcement community, but you can see that the fact that the community can't even agree as of today as to what those standards should be for both interpretation and the validation of this software just belies the ongoing dispute and the lack of general acceptance for this type of technology as it applies to precisely these types of samples. How would you respond? So, I guess there was one publication that came after the PCAST report that just summarized the results of the 30 or so labs. Why do you think that that is insufficient to show reliability or at least testing at much lower levels than the 20 percent that is suggested by PCAST? For a number of reasons, Your Honor. First and foremost, the lack of independence. If you look at the labs that were performing this, again, they have a mission-oriented objective. They're law enforcement labs. The study, again, was assembled and authored by the creators of StarMix for the sole purpose of defending a product in which they take a lot of understandable personal pride. You have a lack of independence, and that's very important, a very important consideration here. If you review the article closely, too, it shows that there is a problem due to human error in the underestimation of the number of contributors, and the testimony from both Adams and Crane demonstrates that an underestimation of the number of contributors can lead to a likelihood ratio that's unfavorable to the defendant. I also reviewed that article, obviously, in the course of this case, and if the court were to do that, it'll show that the minor contributor didn't go, it doesn't show that it went as low as it did here in terms of volume. It shows false positives due to allele sharing and masking, which is something that Dr. Crane testified about. It shows problems during processing causing exclusions of known contributors. To that point, I wanted to highlight for the court that the government had different information, or the law enforcement labs had information that there were, the firearm was taken out of the custody of a known felon who said that he touched the firearm. We have a police officer recorded, two police officers recorded saying that they touched it, and the government's theory is that Daniel Giffson Tanner touched it. Counsel, I appreciate the point you're making, but one tricky thing for the Court of Appeals here is the Abusive Discretion Review, on the one hand, which suggests it's very case-specific, district court judge-specific, record-specific as to that case, and then on the other hand, having a system in which we're processing criminal cases where there's some equivalence across cases. I mean, it doesn't seem to me StormX is going away. I mean, even the PCAST report supports it at 20% and then says that'll go lower as you get more expertise in implementing it. This is what troubles me about your pushback on the last three factors. I would have thought it's time for a Court of Appeals to say this kind of thing is fine, but drill down on the validation, drill down on exactly how it's used in this case, because that should be case-specific. That works fine for me, but you want to be suggesting that StormX isn't ready for prime time in a very large swath of cases, and that doesn't seem like an abusive discretion issue at all. That seems like an issue for a Court of Appeals to figure out what's the right approach here for the six of the four states in our circuit. Your Honor, affirming the Court's opinion in this case won't, will not be used as a cudgel against all applications of StormX, and I don't think that's the direction the Court needs to take its analysis. Well, you still won't tell us what works. I mean, you wouldn't respond to Judge Bush's question about what works. How do we, I don't see where Judge Neff says what works. What is the answer of the what works? More testing by an independent body. I think that's what PCAST demands, and that's what the community is demanding. And then it's up to a district court judge whether that was enough, and then that gets abusive discretion review, right? That's the path you would like. That is a path of inequality of law. I'm not following, Your Honor. I'm making the point that without any bright line rules, any safe harbors, it will turn on the discretion, the unelected conscience of each district court judge in the circuit. That is not healthy when it comes to equivalent application of the law across a lot of criminal cases and a lot of individuals. So that's where I'd like some help. And that's where discretion falls down on the job. If I may address Your Honor's point, I see that my time is up. You can go on for three hours if you have an answer. Well, I may have an answer, but it may not satisfy the court to the degree it wishes. I think in this case, once we've, there is an established threshold that we're not disputing, and that's for mainstream samples, quality samples. That is not something that the court needs to address. We're getting there. Twenty percent and over. That's what your test is, right? That I think is probably the best bright line guide. PCAST has not changed its position. That was not simply a decision of one individual. This involves the community that is involved, that works on this on a regular basis. And even in response to the 31 GLABS study and to Dr. John Buckleton's sit down with that community, they didn't change their position. They just need a little bit more. This is acceptable for simpler mixtures. I'd like to, I think that U.S. v. Lewis, the District of Minnesota's decision in 2020 in this case illustrates how this is not difficult for a court to do. The court distinguished the type of sample in that particular case from the low template DNA sample here in Giss and Tanner, noting that there is six times more DNA in that particular case and a greater contribution at large from the person of interest. This is not a difficult assessment to do it on a case by case basis. I do think eventually. Counsel, that explains exactly my orientation of the case. I want to say the last three factors plainly support Stormix. And I want to focus on the first factor in validation. And validation was the key reason, not the only reason, but the key reason for Judge Neff's decision. But you have this oddity that she didn't let them explain the answer to the last question. Why not let that take forth? That's very case specific. It seems consistent with Lewis. And they either have more validation or they don't. Even if that validation, even if they were to have given the likelihood ratios and demonstrated that they repeated those tests such that there was some precision to the likelihood ratio that was generated, we're still only talking about five samples on this old version. And this is all done without any sort of standards. It's all done any sort of agreement in the community about how to interpret that mixture and how to validate a probabilistic genotyping system. Nothing is binding. So even this particular factor, the testing doesn't get off the ground without those standards being in play. It sounds like you're saying though, counsel, if there's no agreement in the community as to how many you need, you would never let in Stormix. No, that's absolutely not what I'm saying. Then what is the agreement? What is the agreement in the community as to how many you need? There is no agreement. And I think that every case there's not going to be an agreement. The incentives are not high to get an agreement. It would look. Respectfully, there is an agreement that for the simpler mixtures, Stormix is appropriate. We've reached that. And there may be a few outliers that don't agree, that think Stormix is too risky for any sort of mixture. But that's very different from what we have here for these complex low template DNA mixtures. It's very different. No one's disputing its admissibility and whether the testing is robust enough and independent. One thing you didn't respond to was my point that what is so bad about your concern about this being on the outer edge of the community's accepted, being accounted for through the lens of whether they've met their burden of proof to show beyond a reasonable doubt this is the right person. It seems to me that's a very powerful argument in front of a jury that the scientific community only thinks this is a possibility. That isn't remotely beyond a reasonable doubt unless you have this eyewitness testimony or something else to bolster it. Why isn't that the way to solve this last problem? It's very important. This is a very difficult issue. This was four days of testimony, detailed technical testimony over nearly two years, opposing camps of experts, both domestic and international, explaining concept scientific issues and conceding the subjectivity and the variability all without controlling samples. This is not a simple thing. And there is a real dispute over what the underlying data is. That is the purpose of Daubert to make sure courts do this all the time in 404B analyses, for instance. It's also a federal rule of evidence 102 seeks to avoid just that type of unjustifiable expense and delay. And that's what this Daubert hearing, the purpose that was served here. All right. Well, thank you so much for answering our questions, including going beyond the time. You'll get your rebuttal. Thank you, Your Honor. So I want to start out talking about internal validation because that seems to be the focus of where we are right now. Internal validation is limited in scope, right? So what StarMix does here is it takes the output of traditional DNA analysis, that electrophorogram, and it just does math on that output, right? And so what they're trying to do in internal validation is say, is there something weird about how the software is going to behave in our lab that's unexpected? We know the software works. It's been tested. It's been published multiple times. We know the software works, but is there something, it's a gut check, is there something different about our laboratory? So they're not seeking to do all these extreme experiments to figure out where the error is. And so when you look at what they did here, they tested in the original summary of the internal validation study, they tested down to 26 picograms underneath the 49 picograms here. They tested down to 4% for the percent contributed by the minor contributor. Well, covering the 7% here. And so that was the gut check to say, okay, you know, these samples are clearly within the realm of what StarMix can handle based on all the other work. Let me interrupt for a second. Was there a test of both of those factors together at the same time? The picogram level and the percentage of the OPI number? Your Honor, there was, it just was not written up and included in the summary of the internal validation study because no one thought that was done. But that was what the district court did not allow the government to bring back or to offer as proof as rebuttal. Well, no, it did, Your Honor, because the government introduced the letter showing exhibit 40, showing that those experiments have been done. But then, you know, Dr. Crane says, well, actually now it's, he said it's helpful. It's on point. It's what I was looking for. But now I actually want to see the electropharograms and the likelihood ratio. And if we go back and do it again, there's just going to be more of that because you can always pull on the string a little bit further. Why are you so sure about that? Why not give them the benefit of the doubt? What's the problem about, because you are saying the state did not have a chance to produce those numbers, right? Correct. Tell me why it's such a fool's errand to let the state produce those numbers for Judge Neff. I don't understand why that's a fool's errand necessarily. Well, Your Honor, if that's, if that were the limited scope and that was the only question, well, we want to see more data. We want to see the electropharograms and that's going to be the end of the inquiry. That would be one thing. But I think if you look at the history of the litigation here, you know, the arguments have changed about half a dozen times in terms of what we're talking about. You know, don't blame them for that. I mean, this is unusual stuff. I'm not, I'm not going to be a skeptic about that. But if you have a decision from the Court of Appeals that says the last three Dalbert factors favor Stormix, they were underappreciated by the District Court Judge. It was still fair for the District Court Judge to be focused on internal validation. That does seem fair and appropriate, particularly at the outer edges. We just think the government should have been given a chance to produce the numbers. I don't know why, I'm not sure why you're so reluctant to think that's a way to handle this. Well, Your Honor, I think it's because of just what I said before, the development of the proceeding. I mean, obviously that would be a... You don't trust the District Court Judge is what's going on. This takes us back to the whole abuse of discretion problem. Each District Court Judge has 25 different Stormix rules. Well, Your Honor, I think that's mostly right. I wouldn't say that I don't trust the judge. I do trust the judge. I think that the judge here was caught up with and was led astray by the power of the evidence. I think some of the remarks at the hearing and also the fact in the opinion, the court a couple of times mentions, you know, in criminal cases, we need a higher standard where life and liberty is on the line. Let me put this, let me put this shoe on the other foot. Suppose the evidence showed, exonerated the defendant here, that none of it, you know, the conclusion of the lab was that, under Stormix, that the defendant's DNA is not present or not, or he wasn't a contributor. What would the government's argument be then in terms of the standard for validation? Would you accept, I mean, presumably, there's going to be some case in the future where it exonerates the defendant. What's the standard for admissibility from the government's perspective? Well, I can tell you in one of my cases that if this same evidence with the same level of validation showed that it exonerated a defendant, then I would move to the government's position is that Stormix is admissible in every case. Well, when, right, when the validation, when the validation supports the work that was done in the case, the government thinks all the evidence shows was done here. Well, Judge Bush wants to be even more specific. Actually put the shoe on the other foot. In this case, it would suffice to be absolutely, absolutely. Yes. But is there any case where it would not suffice? Well, well, sure. I mean, I think in, you know, if we want to take a hypothetical based on this case, the government's position has been, you know, the validation study, the summary clearly supported down to 4% or 26 picograms, ignoring this interaction effect, which, you know, the government thinks that argument has been contrived. But I think in this case, if the Michigan State Police were saying, well, we tested a sample that was 2% of the mixture with only 5 picograms, we wouldn't be offering that evidence here. Now, if the science develops, that may change, right? I mean, they may revalidate at lower levels, but I'm, but based on this record, yes, there were boundaries beyond which we wouldn't support the work. But, you know, I mean, the reason we're unlikely to see the case is because the laboratory is not going to bring that test in the first place because they want to stay within the parameters they validated on. Can I ask, council on the other side suggested that five cases aren't really all that much. Do you, do you have a view of when you're getting down to, or actually at any level, how much validation should be done? How many tests to confirm accuracy should be done in order to make sure that it's reliably working? Is there, is there something in the record that suggests that there's standards on this? Well, it's, it's the SWGDAM, SWGDAM standards. And I know reproducibility is important. I don't recall if the SWGDAM standards say, you know, you have to run a hundred trials at this level. I think they're a little bit more general than that in terms of, of what you have to do. And we don't have testimony on, on sort of what those thresholds are. But I, I think it's a bit of a red herring to say, well, there were only five experiments at those levels because of course, Dr. Crane at his deposition said, I just want to see that they've tested where the samples are, are, are that low. And they said, okay, we'll, we'll write some of them up. And I think there's even a footnote that says, well, there are even more of them out there, but he was just asking to see that they had checked that low. Right. And, and when they had checked those parameters separately, you know, they put forth the data in the, in the initial validation summary, right. They, they, they showed how many times they'd done it. And there's some discussion about the degree of reproducibility. But it is a summary of the validation study where they're talking about what they did in prose and setting forth some of the data. They're not, they're not sort of appropriate because that's not what Daubert requires. Daubert doesn't require, you know, the laboratory to issue a thousand page validation study with all the data, you know, that's in their, in their system. All right. Thanks to both of you for the, by the way, the briefs were terrific in this case on both sides. So really grateful. It's obviously a difficult case and of course, appeals haven't had too many chances with this. So I'm really grateful for all the questions. They were really helpful. And we always appreciate when you try to answer the questions, which is not what everyone does. So thank you for doing that today. So thanks so much. The case will be submitted and we'll call the next case. Thank you. Thank you.